IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BENJAMIN ALAN DOBBS, | No. 87427-6-I |
| Appellant, | |
| v. | DIVISION ONE |
| SHELBY TOWNSEND DOBBS, | UNPUBLISHED OPINION |
| Respondent. | |

CHUNG, J. — This is an appeal of the orders entered after a trial for the dissolution of the marriage of Ben and Shelby Dobbs. On appeal, Ben Dobbs challenges the trial court's division of community property, calculations for spousal maintenance and child support, and conditions in the parenting plan. As we find no error, we affirm. We also decline both parties' requests for attorney fees on appeal.

BACKGROUND

Ben and Shelby Dobbs[1] married in May 2002 after living together for four years. They had two children together and purchased a home on Mercer Island in 2020. During their marriage, they made many upgrades to their home, including remodeling two kitchens and installing a spa, a geothermal heating system, and a soccer field.

In November 2022, Ben traveled to Spain with the intention of exploring a potential relocation, which he discussed with Shelby. Then, on May 10, 2023, Ben expressed to Shelby his desire to separate and move to Spain. In July 2023, Ben

[1] Because the parties share a last name, we refer to them by their first names for clarity.

moved to Spain. Ben and Shelby attempted to divide assets with a financial planner and determine a parenting plan but disagreed about the possibility of the children visiting Ben in Spain. Ben formally filed for divorce in September 2023.

Ben and Shelby's children were both minor teenagers at the time of filing and during the trial. A temporary parenting plan was filed in November 2023, providing that the children would live with Shelby full-time and Ben would have limited electronic visitation. While the temporary parenting plan was in place, Ben and Shelby experienced two significant conflicts involving Ben's visitation with the children outside of the times set out in the plan. First, on Christmas Eve 2023, Ben was scheduled to visit with his children on FaceTime, Skype, or Zoom. Instead, Ben got an Airbnb one block from the marital home and, according to Shelby, he "coerced" her into allowing him to see the children for more than the scheduled time. Specifically, he texted her that he was sick and needed to go to the emergency room; called her three times during Christmas Eve dinner; and then, when she agreed to leave medication and "a machine" for him outside the family house, he showed up and told Shelby that his rented room did not have a stove and he couldn't use the time to clear out [his] sinuses." Shelby claimed he "let [him]self in" the house because, even though she did not invite him in, the children were excited to see him and invited him in to watch a Christmas movie.

In summer 2024, Ben claimed that Shelby interfered with his visitation under the temporary parenting plan when she scheduled a summer camp and a soccer tournament for the children during the scheduled visitation time. Due to this scheduling conflict, Ben filed a motion to modify the temporary parenting plan and the court entered an order allowing Ben to visit the children from August 11, 2024, to August 18, 2024, in

2

King County. The order also provided that Ben could temporarily use the parties' 2018 Tesla for purposes of visiting the children. Ben and Shelby had a disagreement about the timing and manner of exchanging the Tesla, and Ben threatened to involve the police. Shelby provided the Tesla to Ben in "valet mode"[2], and without a charging cable or adapter. Ben believed Shelby was using the Tesla app to track him and the children, and "messing with things on the car" while he used it. On August 13, Ben drove to the courthouse with the children to file an ex parte restraining order against Shelby, seeking full possession of the car and custody of the children. After Ben filed his motion, Shelby took the car off valet mode. The court denied Ben's motion on August 19 and the dissolution trial began on August 20, 2024.

In preparation of trial, Ben submitted exhibits pertaining to the finances of Dobbs Data Services (DDS), a business he and Shelby co-owned at incorporation and which Ben continued to run post-separation from Shelby. Shelby filed motions in limine to exclude some of those exhibits as hearsay. Further, Shelby sought to exclude Ben's exhibit 90, which was written entirely in Spanish. The court granted the motions to exclude Ben's exhibit 95, which was a purported valuation of DDS, as well as exhibit 90. At trial, the court excluded two additional exhibits of Ben's pertaining to DDS, exhibits 58 and 59, for lack of foundation.

The court entered the final divorce order and findings and conclusions about a marriage on October 21, 2024. In its asset division, the court granted Ben ownership of DDS and Shelby ownership of the marital home, valued at the time of separation at $2.6 million. The court ordered Ben to pay $3,500 in monthly spousal maintenance from

---

[2] Valet mode is a restrictive setting used when a driver valets their car.

October 11, 2024, to September 11, 2028, and $1,737.40 in monthly child support. Additionally, regarding Ben's residential time with the children, the final parenting plan ordered that Ben "shall have in person visits in King County, WA, or within the United States, unless the children ask to visit their father internationally, be it in Spain or another country, so long as the country is a signatory to the Hague Convention."

The court also found that Ben did not abandon or neglect his children, neither Ben nor Shelby engaged in abusive use of conflict, and Ben's testimony was not credible. Ben now appeals.

DISCUSSION

Ben argues that the trial court abused its discretion in (1) making a disproportionate division of property based on an improper characterization of DDS as community property and an improper valuation of DDS; (2) ordering spousal maintenance and child support based on an incorrect evaluation of his income; and (3) placing geographic restrictions on Ben's residential time and restricting his ability to communicate with his children about visiting him abroad in Spain. We disagree and affirm.

I. Asset Division

In a proceeding for the dissolution of marriage, the court shall distribute the property after considering just and equitable factors, including the nature and extent of community and separate property, the duration of the marriage, and the economic circumstances of each spouse. RCW 26.09.080. We will reverse a trial court's division of property only if the trial court manifestly abused its discretion. In re Marriage of Wright, 179 Wn. App. 257, 261, 319 P.3d 45 (2013). A trial court abuses its discretion if

4

its decision is "manifestly unreasonable, or based on untenable grounds or reasons." Id. at 261-62.

Here, the trial court determined that both the marital home and DDS were community property. It awarded Shelby the marital home, which it valued at $2.6 million.[3] The court explained its intention of offsetting the inequity by granting DDS to Ben, which it thought "probably has a very high value." Ben contends that this division was in error because the court incorrectly determined that DDS was community property.[4] Ben also contends that the court improperly excluded his exhibits pertaining to DDS's value, and, thus, it improperly valued DDS and inequitably distributed Ben and Shelby's assets. We disagree.

A. Characterization of DDS as Community Property

"A trial court's characterization of property is a mixed question of law and fact." In re Marriage of Watanabe, 199 Wn.2d 342, 348, 506 P.3d 630 (2022). "A trial court is not bound to award property to the individual or the community based on the property's classification but 'the court must have in mind the correct character and status of the property as community or separate before any theory of division is ordered.' " Schwarz v. Schwarz, 192 Wn. App. 180, 191, 368 P.3d 173 (2016) (quoting Blood v. Blood, 69 Wn.2d 680, 682, 419 P.2d 1006 (1966)). We review the trial court's factual findings for substantial evidence and the characterization of property de novo. Id. at 192.

Washington presumes that assets acquired during marriage are community property. In re Marriage of Chumbley, 150 Wn.2d 1, 5, 74 P.3d 129 (2003). "To rebut

---

[3] The court also awarded Shelby the household furnishings valued at $200,000 and assigned her community debt, including a mortgage of $1,257,090 and a personal loan for $50,000.

[4] Ben raises this contention for the first time on appeal. Ben conceded at trial that the court had discretion to characterize DDS as community property.

the presumption, a party must present clear and convincing evidence that the acquisition fits within a separate property provision." Id. at 5. Further, "property acquired during marriage has the same character as the funds used to purchase it." Id. at 6. See, e.g., Watanabe, 199 Wn.2d at 353 (governing factor is whether property was " 'acquired by community funds' " and property is presumed community property unless rebutted (internal quotation marks omitted) (quoting Finley v. Finley, 47 Wn.2d 307, 312, 287 P.2d 475 (1955)). "Where there is any uncertainty in tracing an asset to a separate property source, the law resolves the uncertainty in favor of a finding of community character." In re Marriage of Gillespie, 89 Wn. App. 390, 400, 948 P.2d 1338 (1997) (citing Connell v. Francisco, 127 Wn.2d 339, 351, 898 P.2d 831 (1995)).

Ben argues on appeal that DDS is his separate property because it did not earn income until after Ben and Shelby separated in May 2023. However, the characterization of an asset as separate or community property does not turn on when the asset generated income but instead on when and how it was acquired. "The legislature defines separate property as property acquired before marriage or acquired after marriage by gift, bequest, devise, or descent." Chumbley, 150 Wn.2d at 5 (citing RCW 26.16.010).

The court found that DDS was formed during the marriage with community funds and incorporated with Shelby as a 51 percent owner. Ben does not contest this finding, and unchallenged facts are verities on appeal. See Zunino v. Rajewski, 140 Wn. App. 215, 220, 165 P.3d 57 (2007), overruled in part by Hanna v. Margitan, 193 Wn. App. 596, 373 P.3d 300 (2016). Because DDS was formed with community funds, it is presumed to be community property. See Watanabe, 199 Wn.2d at 353. Ben does not

6

contest this presumption, much less rebut it with clear and convincing evidence.[5]

Therefore, the court did not err in characterizing DDS as community property.

    B.  <u>Exclusion of Ben's Exhibits Relevant to the Value of DDS</u>

    Also regarding DDS, Ben claims the trial court erred by excluding four exhibits relevant to determining its value: exhibit 58, a "Dobbs Data Service income statement"; exhibit 59, a "Dobbs data service long P&L spreadsheet"; exhibit 90, "Dobbs Data Service estimated taxes"; and exhibit 95, a "Valuation of Dobbs Data Service." We review the trial court's decision to exclude evidence "for abuse of discretion, deferring to the trial court's judgment unless we are 'convinced that no reasonable person would take the view adopted by the trial court.' " <u>Gerlach v. Cove Apts., LLC</u>, 196 Wn.2d 111, 119, 471 P.3d 181 (2020) (emphasis omitted) (internal quotation marks omitted) (quoting <u>Gilmore v. Jefferson County Pub. Transp. Benefit Area</u>, 190 Wn.2d 483, 494, 415 P.3d 212 (2018)). Here, the trial court's exclusion of these exhibits was not unreasonable.

    Exhibits 58, 59, and 95 were documents prepared by a financial analyst who did not testify at trial. Ben argued the exhibits were admissible because, although he did not prepare the documents himself, he assured the court that "I reviewed the information for its accuracy before submitting it . . . so this is basically coming from me just as much as him." Additionally, the exhibits were undated, did not reference the information used to

---

[5] In further support of her argument that DDS was community property, Shelby argues that "Ben's clients included contacts that he had fostered and developed during the marriage" and "[t]he continued patronage of these contacts after separation was thus the result of goodwill built by Ben during the marriage, based on his name, reputation, talent, and ability." However, the trial court did not make any findings to this effect. Thus, we do not consider this argument or evidence in our review. <u>See</u> <u>Greene v. Greene</u>, 97 Wn. App. 708, 714, 986 P.2d 144 (1999) ("[W]here the trial court has weighed the evidence, the reviewing court's role is simply to determine whether substantial evidence supports the findings of fact and, if so, 'whether the findings in turn support the trial court's conclusions of law.' " (quoting <u>Org. to Preserve Agric. Lands v. Adams County</u>, 128 Wn.2d 869, 882, 913 P.2d 793 (1996))).

complete them, and did not indicate that they were related to DDS. Considering the foundation provided by Ben, the trial court excluded the exhibits because they were hearsay and could not be authenticated.

This decision was not unreasonable. A court does not abuse its discretion if it excludes evidence because it is "not satisfied with the level of proof" as to a document's authenticity. State v. Payne, 117 Wn. App. 99, 110, 69 P.3d 889 (2003). For example, in Payne, this court held the trial court did not its abuse discretion by excluding evidence where "the court had concerns about where the . . . information came from, how it was compiled, and who compiled it," even though it had been presented with "circumstantial evidence" that "supported the document's authenticity." Id. Here, as in Payne, it was not unreasonable for the court to exclude exhibits 58, 59, and 95 because of insufficient proof of their authenticity.

The trial court also did not err by excluding exhibit 90, which was entirely in Spanish. The court reasoned, "it would violate Ms. Dobbs's right to knowing and full participation in a trial if one of the main exhibits is in a language neither she or her attorney understand." Moreover, Ben, the party offering exhibit 90, provided no translation of the document. Accordingly, the court had tenable reasons for excluding this exhibit. Therefore, the trial court did not abuse its discretion by excluding exhibits 58, 59, 90, and 95.

C.  Valuation of DDS

Ben also argues that even if DDS was community property, the trial court improperly valued it and, therefore, the division of property was inequitable. The trial court awarded Ben DDS to offset the award to Shelby of the marital home, valued at

8

$2.6 million, because it determined that DDS "currently and historically has had potential for substantial earnings." Ben contends the trial court's reasoning was untenable.[6] We disagree.

A court's decision is based on untenable reasons "if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard." In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997). We review a court's property valuation for substantial evidence. In re Marriage of Porter, 3 Wn.3d 579, 588, 555 P.3d 379 (2024). "Determination of the value of a corporation 'contemplates a consideration of all the facts and circumstances pertinent to a particular case . . . which may in some degree be lacking in mathematical exactness or certitude.' " In re Marriage of Berg, 47 Wn. App. 754, 757, 737 P.2d 680 (1987) (quoting In re Nw. Greyhound Lines, Inc., 41 Wn.2d 672, 680, 251 P.2d 607 (1952)). The record must be sufficient for this court to "determine the method by which the trial court determined valuation and the weight that the trial court gave to the factors relevant to valuation." Id. at 757.

Specifically, Ben contends that the trial court erred because in "valuing [DDS's] nonphysical goodwill assets," it did not articulate the factors outlined in In re Marriage of Fleege, 91 Wn.2d 324, 588 P.2d 1136 (1979);[7] did not "follow one of five methods" for

_____

[6] Ben argues that "[f]uture earnings of a business may be considered for dividing assets [only] when those earnings are based on efforts that occurred *during* the marriage, and only *if* supported by the evidence." To support this proposition, Ben cites In re Marriage of Leland, 69 Wn. App. 57, 847 P.2d 518 (1993). But Leland did not concern the future value of a business; it concerned disability payments. See id. at 58. Ben did not provide analysis of how this case supports his proposition. Accordingly, we decline to further consider this argument. See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (court will not consider argument unsupported by reference to the record or citation to authority).

[7] "Among the elements which engender goodwill are continuity of name, location, reputation for honest and fair dealing, and individual talent and ability." Fleege, 91 Wn.2d at 325-26. In Fleege, the business owner presented the testimony of two certified public accountants, who testified to the value of the business including the value of the goodwill, articulated as a specific monetary value. Id. at 325.

9

valuing goodwill articulated in In re Marriage of Hall, 103 Wn.2d 236, 692 P.2d 175 (1984); and it did not specify a method of valuing goodwill.

But the trial court did not assign *any* monetary valuation to DDS, nor to goodwill assets. In its oral ruling, the court noted that DDS "clearly has value" and "clearly has had a historical high-income earning capacity," based on testimony "about the number of contractors, the number of contracts, how much income the business made, the fact that [the court] didn't find [Ben's] testimony credible on the business expenses." However, the court also explained that it "didn't assign a valuation to [DDS] because [Ben] didn't provide admissible evidence about the evaluation of it." While Ben testified that the business had significant expenses offsetting its profitability, the court found his testimony not credible and unsupported by evidence.

Moreover, Ben does not identify admissible evidence presented to the trial court on the Fleege factors or as to any method of valuing goodwill. Indeed, Ben acknowledged during oral argument that neither he nor Shelby asked the court to value DDS.[8] While he suggested at oral argument that he had proposed a finding of the value of DDS as $0 and Shelby proposed a finding of the value of DDS as $10,000,[9] and, therefore, the trial court could have chosen a value between those figures, he does not identify evidence of these proposed findings in the appellate record.[10]

---

[8] Wash. Ct. of Appeals oral arg., Dobbs v. Dobbs, No. 87427-6-I (Jan. 9, 2026), at 2 min., 25 sec. through 2 min, 29 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2026011254/?eventID=2026011254 (conceding neither party asked the court to place a specific value on DDS).

[9] Wash. Ct. of Appeals oral arg., supra, at 2 min., 36 sec. through 2 min., 44 sec.

[10] Ben also argued that the court could have made an "adverse inference" *against* him and valued DDS at $0. In support, at oral argument, he cited an unpublished opinion, In re Marriage of Ravenet, No. 87253-2-1 (Wash. Ct. App. Dec. 8, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/872532.pdf. Wash. Ct. of Appeals oral arg., supra, at 2 min., 41 sec. through 2 min., 56 sec. In Ravenet, a party "improperly blocked . . . access to the accounts, did not answer [the] discovery requests in full, and failed to produce a complete set of bank records consistent

Ben also argues that the trial court relied on an "improperly timed" valuation of DDS. However, when Ben asked about the timeframe of the DDS valuation, the trial court explicitly stated it could not answer because Ben "didn't give any admissible evidence about [DDS's] value either [at] separation or post-separation."

Ben argues that because, in valuing DDS, the court found Ben not credible, the trial court lacked substantial evidence for its findings as to DDS's value. But the trial court "must determine disputed facts by weighing the credibility of witnesses' testimony." Johnson v. Dep't of Licensing, 71 Wn. App. 326, 332, 858 P.2d 1112 (1993). And "[t]he deference accorded under the substantial evidence standard recognizes that the trier of fact is in a better position than the reviewing court to evaluate the credibility and demeanor of the witnesses." Peterson v. Big Bend Ins. Agency, Inc., 150 Wn. App. 504, 514, 202 P.3d 372 (2009). On appeal, a court will not " 'substitute [its] judgment for the trial court's, weigh the evidence, or adjudge witness credibility." In re Marriage of Rockwell, 141 Wn. App. 235, 243, 479, 170 P.3d 572 (2007) (quoting Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999)).

The trial court's determination that DDS "had potential for substantial earnings" is supported by substantial evidence. Even if the court found Ben not credible in other respects, it was entitled to credit Ben's testimony that DDS brought "a lot of money" in when it had about five contractors at once. The record also included Ben's personal

---

with" the local court rules. No. 87253-2-1, slip op. at 14. We held it was not an abuse of discretion for the court to "dr[a]w an adverse inference" against the party and award "all debt associated with the community accounts" to him. Id. But here, as Ben acknowledges, the trial court did not make an adverse inference. Wash. Ct. of Appeals oral arg., supra, at 2 min., 56 sec. through 2 min., 58 sec. Ravenet is also inapposite as there because the court assigned a value to the asset being divided (the parties' accounts), No. 87253-2-1, slip op. at 14 n.11, and here, the court assigned no value to DDS. Regardless, the trial court did not err when it refrained from making a factual finding, either via adverse inference or based on Ben's proffered valuation of DDS at $0.

2023 tax return as the business income tax return for DDS, which indicated $162,000 in earnings for the year. Ben's proposed child support worksheet listed Ben's business income as $27,303 per month. And Ben testified that with his current contract, "if I am able to start working full time again after this with the full hours, then I should be making a solid amount of money."

The record did not include credible or admissible evidence to counter the information in his personal 2023 tax return or proposed child support worksheet, so the trial court did not err by relying on those documents to determine his income from DDS. See In re Marriage of Hadley, 88 Wn.2d 649, 659, 565 P.2d 790 (1977) (trial court did not err in taking valuation from financial statement where it was presented with "no evidence to the contrary"). Even if it did not assign a specific value to DDS, its findings that DDS "currently and historically . . . had the potential for substantial earnings," as well as its findings as to Ben's income, which came solely from DDS, were supported by substantial evidence.

Thus, the court had a tenable basis to award Ben DDS to offset the distribution of the marital home to Shelby. The trial court did not abuse its discretion in its asset distribution.

## II. Calculation of Spousal Maintenance and Child Support

Ben challenges the trial court's orders of $3,500 monthly in spousal maintenance and $1,737.40 monthly in child support, claiming the trial court miscalculated his income and expenses. We disagree.

This court reviews child support and spousal maintenance orders for abuse of discretion. In re Marriage of Kaplan, 4 Wn. App. 2d 466, 481, 421 P.3d 1046 (2018). "A

trial court abuses its discretion if its decision rests on unreasonable or untenable grounds." In re Marriage of Schnurman, 178 Wn. App. 634, 638, 316 P.3d 514 (2013). " 'In determining whether substantial evidence exists to support a court's finding of fact, the record is reviewed in the light most favorable to the party in whose favor the findings were entered.' " Kaplan, 4 Wn. App. 2d at 479 (quoting Gillespie, 89 Wn. App. at 404).

In ordering child support, the court must consider "the child's basic needs in addition to the parents' income, resources, and standards of living." In re Marriage of Ayyad, 110 Wn. App. 462, 470, 38 P.3d 1033 (2002); see RCW 26.19.001. Where the parents' combined net monthly income exceeds the highest amount in the statutory economic table ($12,000), the trial court may order more than the maximum amount of child support provided by the table if it provides written findings of fact demonstrating its consideration of the parents' income, resources, and standard of living. Leslie v. Verhey, 90 Wn. App. 796, 804, 954 P.2d 330 (1998) (citing former RCW 26.19.020 (2018)).

Here, the trial court articulated its considerations for the amount of child support it ordered, including its reasons for declining to order an upward deviation from the statutory table as requested by Shelby. Ben primarily challenges the court's assessment of his income.

As an initial matter, Ben claims the court erred by imputing income to him because it did not consider any of the statutory factors to impute income under former RCW 26.19.071(6) (2020). He argues that the court instead relied on his testimony, personal 2023 tax return, and proposed child support worksheet.[11] However, the court

---

[11] Ben did not provide the court with any of the information needed to make such imputations. Former RCW 26.19.071(6)(a)(i)-(iii) provides that in the absence of records of a parent's actual earnings,

did not impute income to him. Even though the court checked the box stating that his net monthly income of $27,000 was "imputed to this parent" on the child support order, immediately thereafter, in section 6, "Imputed Income," the court checked the box next to the words "Does not apply. This parent's actual income is used." Then, in the child support worksheet, for Ben, the court listed only $27,000 of "business income" and left the option of "imputed income" blank. The only evidence presented at trial from which the court could determine Ben's income was his testimony, his 2023 tax return, and his proposed child support worksheet. Accordingly, it was not error for the trial court to determine Ben's income based on the information available to it.[12]

The trial court considered Ben's testimony that his monthly net income was $4,954; his personal 2023 tax return, where he reported $162,000 in annual earnings; and "his own proposed child support worksheet" where "he acknowledged grossing $27,303 a month in business income." The trial court did not consider the $64,467 Ben claimed in annual business expenses because it found his testimony not credible—a finding we may not disturb on appeal. See Kaplan, 4 Wn. App. 2d at 479 (appellate court should not weigh the evidence or adjudge witness credibility). Thus, there was substantial evidence to support the trial court's finding that Ben's "gross monthly income

---

the court shall impute a parent's income using, first, "[f]ull-time earnings at the current rate of pay"; second, "[f]ull-time earnings at the historical rate of pay based on reliable information, such as employment security department data"; and third, "[f]ull-time earnings at a past rate of pay where information is incomplete or sporadic." The statute also provides other alternatives for imputing income—e.g., if the parent "is on or recently coming off temporary assistance" or "has a recent history of minimum wage earnings, has never been employed and has no earnings history, or has no significant earnings history," former RCW 26.19.071(6)(a)(iv)-(v)—but Ben does not argue that any of those alternatives apply here.

[12] Moreover, Ben offers no support for his proposition that "a proper statutory imputation would likely have resulted in a more equitable Child Support Order."

for child support purposes is $27,000 [($324,000/year)] and monthly business expenses are $526.42."

Further, it was undisputed that Ben paid child support between $5,000 and $6,000 per month under the temporary orders, and the trial court noted that Ben had been "paying undifferentiated monthly support to the Respondent in the amount of $5,000." Thus, there was substantial evidence that Ben had the means to pay $1,737.40 per month for child support—a far lower amount than he had paid under the temporary orders—as well as the means to pay child support and spousal maintenance of $5,237.40, which was approximately what he had paid for child support alone under the temporary orders.

As for spousal maintenance, the only statutory limitation is that the amount and duration of the award must be "just." Wright, 179 Wn. App. at 269 (citing RCW 26.09.090). The factors to be considered include, but are not limited to:

> "(1) the financial resources of the party seeking maintenance, (2) the time needed to acquire education necessary to obtain employment, (3) the standard of living during the marriage, (4) the duration of the marriage, (5) the age, physical and emotional condition, and financial obligations of the spouse seeking maintenance, and (6) the ability of the spouse from whom maintenance is sought to meet his or her needs and obligations while providing the other spouse with maintenance."

Kaplan, 4 Wn. App. 2d at 481 (quoting In re Marriage of Valente, 179 Wn. App. 817, 821-22, 320 P.3d 115 (2014), abrogated on other grounds by In re Marriage of Wilcox, 3 Wn.3d 507, 553 P.3d 614 (2024)); RCW 26.09.090.

Here, the trial court extensively articulated its findings and the basis for its determination of $3,500 a month in spousal maintenance. As to Shelby's financial resources, the court found that her income was "not sufficient to pay the mortgage, pay

her debts, pay for utilities, food, clothing, school expenses, insurance expenses, medical expenses that exceed her health savings account, or any other financial need that may arise." The court also found that during the course of their 21-year marriage, both parties had "acquired higher education" and cultivated a "comfortable, if not luxurious" standard of living. At the time of trial, Shelby was 47 years old and had obligations including "being the sole daily caregiver for the children" and "being responsive to emails from the children's schools when one of the children has behavioral issues at school that require her to pick him up immediately." Ben does not dispute these findings.

As for Ben's ability to meet his needs and obligations while providing maintenance to Shelby, the trial court considered Ben's income, which, as discussed above, it calculated using his personal 2023 tax return, expressly disregarding his $64,467 in claimed business expenses. And, as described above, substantial evidence supported the trial court's finding as to Ben's ability to pay and Ben had previously demonstrated his ability to pay $5,000 to $6,000 a month in child support alone. Thus, there was substantial evidence that he had the ability to pay monthly spousal maintenance of $3,500 and a total amount of monthly child support and spousal maintenance of $5,237.40.

Finally, Ben argues that the trial court improperly "double-dipp[ed]" by "us[ing] DDS's business valuation as both the source from which the division of assets was made . . . and the source of income from which Mr. Dobbs would be obligated to pay

Ms. Dobbs for five years."[13] However, the cases on which Ben relies do not support his argument. In In re Marriage of Barnett, the trial court awarded the couple's major asset, a salvage business, to the husband, and awarded the wife a lien against the business, including 10 percent interest commencing one year after the dissolution decree, secured by a note and deed of trust. 63 Wn. App. 385, 386-87, 818 P.2d 1382 (1991). The wife also received a $500 monthly maintenance award, which "was an attempt to distribute Mrs. Barnett's share of the business as realized through the future sale of salvage." Id. at 388. This court held that the property distribution was fair and equitable but the maintenance award should terminate either when the 10 percent interest on the lien or the receipt of the lien payment occurred, because the distribution of the wife's share of the business had "already been effected" by the lien awarded to her. Id. at 387-89.

By contrast, in Wilcox, the court affirmed the award of maintenance to the wife where the husband had been awarded a business owned by the spouses—their only significant income-producing asset. 3 Wn.3d at 514-15.[14] The Wilcox court rejected the husband's argument that the court impermissibly double-dipped into his only asset, the business, by ordering a long-term maintenance award. Id. at 527. The court reasoned that "unlike [in] Barnett, the trial court here did not effectively award the same property division twice." Id. at 528.

---

[13] Shelby asks this court to disregard this argument because Ben "never raised this 'double-dipping' theory in the trial court." However, as Ben points out that he disputed the amount of maintenance and its duration at trial. We agree with Ben that he did not waive this argument.

[14] The main issue on appeal in Wilcox was "whether a trial court abuses its wide discretion when it awards spousal maintenance in an amount and duration that exceeds the requesting spouse's needs." 3 Wn.3d at 509. This court affirmed the award, and our Supreme Court affirmed as well. Id. at 510.

Here, unlike in Barnett, the spousal maintenance is not intended to distribute Shelby's interest in DDS. As in Wilcox, where the wife's interest in the business had already been accounted for in the asset division because she received the couple's other major asset, the marital home, here, the court distributed DDS to Ben and the marital home to Shelby. Instead, as discussed above, the court ordered spousal maintenance based on consideration of the proper statutory factors, which included but was not limited to Ben's future income and ability to pay.

In support of his double-dipping argument, Ben also cites to Valente, in which the court rejected the husband's argument that the maintenance award to the wife was a "double dip" into the community property that had been distributed to him, a successful business he had started during the marriage. 179 Wn. App. at 820, 828. In Valente, when calculating the business's future income stream, a financial expert calculated the "net" return for a potential new owner by deducting operating expenses and all salary expenses, including the "reasonable replacement compensation" if "the new owner had to hire someone with [the husband's] knowledge and experience." Id. at 829-30. The Valente court reasoned that "because this reasonable replacement compensation was carved out of the income streams used for valuation, [the wife] was not compensated for [the] replacement salary in the asset distribution, and the maintenance payments do not duplicate the property distribution." Id. at 830. Ben argues that because in Valente, "the company's valuation was not simply based on the company's future income streams," the case implies its reverse—i.e., here, because "DDS' valuation for purposes of the property distribution *was* based solely on future income streams," the court double-dipped. But, as discussed above, the trial court did not place a specific value on DDS or

its future income streams. Because the determination that he could pay maintenance was not based on DDS's income streams, but on evidence of Ben's income, the court did not "double dip."

Therefore, we conclude the trial court did not abuse its discretion in its determination of Ben's income or in its order of spousal maintenance and child support.

III.  Parenting Plan Limitations

Ben argues that the trial court abused its discretion by placing "restrictions" on Ben's "actions" and "involvement with his children" related to visitation absent findings that require such restrictions under former RCW 26.09.191.[15] We disagree.

In particular, Ben assigns error to the provisions in the court's supplemental findings (1) that Ben's visits "shall occur in King County, WA, and may only occur in Spain . . . upon the children's request" and (2) that neither Ben nor Shelby "shall encourage or discourage international visits to [Ben's] country of residence," including that Ben "is prohibited from asking [the children] if they would like to visit him."

As an initial matter, Ben claims the parenting plan "prohibits him from spending time with the children anywhere outside of King County" and imposes "a requirement that all visitation occur solely within King County," citing to the court's supplemental findings. However, the final parenting plan itself includes broader language allowing Ben to spend residential time with his children in King County "or within the United States": "The Father, Ben Dobbs, shall have in person visits in King County, WA, or within the United States, unless the children ask to visit their father internationally, be it in Spain or

---

[15] Ben argues that the court disregarded the "factors outlined in [former] RCW 26.09.187" when it ordered sole decision-making to Shelby. Because he does not support this argument with analysis or authority, we do not consider it. See Cowiche Canyon Conservancy, 118 Wn.2d at 809 (court will not consider argument unsupported by reference to the record or citation to authority).

another country, so long as the country is a signatory to the Hague Convention."

Indeed, when the court presented its orders to the parties, they specifically discussed

the residential time provisions and clarified that the main consideration was that the

default location should be domestic rather than require international travel:

> MR. DOBBS:   And I'm not allowed to do any vacationing with them anywhere outside King County[?] I can't take them to Disney World[?] . . . I can't take them to the car show down in Tacoma[?]
>
> . . . .
>
> THE COURT:   That's not my intent. Mostly when I drafted this parenting plan, I was considering international like Spain and then here in their home.
>
> . . . .
>
> THE COURT:   [Shelby's Attorney], I mean certainly, it wasn't my intent to limit their visits to King County . . . . [W]hat are your thoughts?
>
> [SHELBY'S ATTORNEY]:   I understand. I don't know that Shelby has any objection to them traveling within Washington or the U.S. when he is on those visits. She hasn't in the past.
>
> . . . .
>
> THE COURT:   So, right now what [the parenting plan] reflects is the father, Ben Dobbs, shall have in-person visits in King County, Washington or within the United States . . . unless the children ask to visit their father at his home, be it in Spain or another country. So long as the country is a signatory to the Hague Convention.

The parenting plan also imposed limitations on Ben and Shelby's communication

with their children about traveling for visitation:

> The Court has not prohibited the children from visiting their father in Spain, but visits outside of King County, Washington, shall occur only if the children request it. Neither the Petitioner nor Respondent shall encourage or discourage international visits to the Petitioner's country of residence. The parents may communicate to the children one time post entry of the final parenting plan, with a relative present, that visits with the Petitioner shall occur in King County, WA, and *may* only occur in Spain, or any other

country where the Respondent may reside so long as it is a country that is a signatory to the Hague Convention, *upon the children's request*. Each 3rd party relative must observe this communication and is obligated to intervene if the parent they are observing exceeds the authorized communication or begins to use language that is clearly meant to dissuade or encourage the children to seek a visit outside of King County, WA.

We review a trial court's parenting plan for an abuse of discretion. Katare v. Katare, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). Trial courts wield "broad discretion when fashioning a permanent parenting plan." Id.

When determining residential provisions, a parenting plan "shall include a residential schedule which designates in which parent's home each minor child shall reside on given days of the year . . . consistent with the criteria in RCW 26.09.187 and 26.09.191." RCW 26.09.184(6). In fashioning residential provisions "[w]here the limitations of RCW 26.09.191 are not dispositive of the child's residential schedule," the courts shall consider:

(i) The relative strength, nature, and stability of the child's relationship with each parent;

(ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;

(iii) Each parent's past and potential for future performance of parenting functions . . . ;

(iv) The emotional needs and developmental level of the child;

(v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;

(vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and

(vii) Each parent's employment schedule.

RCW 26.09.187(3)(a). The court is to give the greatest weight to factor (3)(a)(i), the relationship between the children and each parent. Id. The court may also include in its residential provisions "any reasonable terms or conditions that facilitate the orderly and meaningful exercise of residential time by a parent, including but not limited to requirements of reasonable notice when residential time will not occur." RCW 26.09.187(3)(c).

However, "[r]estrictions on a parent's geographic location . . . are not authorized as typical parenting plan provisions under RCW 26.09.187. . . [and] restrictions on a parent's travel or conduct can be imposed only under RCW 26.09.191—not as features of the parenting plan under RCW 26.09.187." In re Marriage of Chandola, 180 Wn.2d 632, 644-45, 327 P.3d 644 (2014). The court must make "a particularized finding of a specific level of harm before restrictions may be imposed" under former RCW 26.09.191. Id. at 646.

Former RCW 26.09.191 (2021), the version of the statute that applied to the Dobbses' dissolution, both requires limitations on residential time under certain circumstances—for example, if the court finds willful abandonment, abuse, or a history of domestic violence[16]—and allows a court to impose limitations in other circumstances. Specifically, former RCW 26.09.191(3) (2021) provides that a court may "preclude or limit any provisions of the parenting plan" if it finds, in relevant part:

> (a) A parent's neglect or substantial nonperformance of parenting functions;

---

[16] Under former RCW 26.09.191(2), a court *must* limit a parent's residential time if it finds that the parent has willfully abandoned a child for an extended period of time; has physically or sexually abused a child or shown a pattern of emotionally abusing a child; has a history of acts of domestic violence; or has been convicted as an adult of certain sex offenses. These mandatory limitations are not at issue in this case.

. . . .

(d) The absence or substantial impairment of emotional ties between the parent and the child;

(e) The abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development; [or]

. . . .

(g) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Former RCW 26.09.191(3)(g) is referred to as the "catch-all" provision. Chandola, 180 Wn.2d at 646.[17] The catchall provision can " 'only incorporate those things similar in nature or 'comparable to' the specific terms' " listed. Id. at 647 (internal quotation marks omitted) (quoting Simpson Inv. Co. v. Dep't of Revenue, 141 Wn.2d 139, 151, 3 P.3d 741 (2000)). In Chandola, our Supreme Court concluded that the legislature intended former RCW 26.09.191(3)(g) restrictions to apply only when necessary to prevent harms "similar in severity to the harms posed by the 'factors' specifically listed" in former RCW 26.09.191(3)(a)-(f). Id. at 648. The harms must be "more than the normal distress suffered by a child because of travel, infrequent contact of a parent, or other hardships which predictably result from a dissolution of marriage." Littlefield, 133 Wn.2d at 55. "A trial court abuses its discretion if it imposes a restriction that is not reasonably calculated to prevent such a harm." Chandola, 180 Wn.2d at 648.

Thus, in Chandola, the court determined the trial court did not abuse its discretion when it limited the father's residential time with his child and prohibited him

_____

[17] The "catchall provision" in Chandola was former RCW 26.09.191(3)(g) (2012), which contains the same language as the version that applied to the Dobbses' dissolution, former RCW 26.09.191(3)(g) (2021).

from co-sleeping with his child. Id. at 651-53. Record evidence demonstrated that the father interfered with the child's "sleep, nutrition, and socialization" by "constant[ly] holding" his child to the point she was prevented "from exploring and socializing," refusing "to establish a sleep or meal schedule for her," and interrupting her sleep to hold her in the middle of the night. Id. at 649-52. The trial court was presented with evidence that the child "had made substantial emotional and social progress since her parents' separation (which reduced her time with [her father])." Id. at 651. On appeal, the court affirmed the restriction on the father's residential time because "the trial court clearly intended to ensure that this progress continued unhindered. There [wa]s substantial evidence in the record to support the conclusion that these restrictions were reasonably calculated to accomplish that end." Id. at 651-52. Likewise, the co-sleeping restriction was "reasonably calculated to prevent mental and physical harm to [the child]." Id. at 653.

Like the limitations affirmed in Chandola, the limitations here were reasonably calculated to prevent emotional harm to the Dobbses' children. While the trial court affirmatively found that "neither parent has any of [the] problems" specified under former RCW 26.09.191(3)(a)-(f) (2021), it noted that it "was really a close call" as to whether Ben engaged in abusive use of conflict under former RCW 26.09.191(3)(e) (2021). Ben testified that he drove the children to the court when he sought the restraining order against Shelby in August 2024. Ben also had a group chat with the children called "kids and the bitch." Because the children did not testify, it was not known to the trial court if the children knew why they were at the courthouse with Ben, or if the kids were aware of the group chat name. But the trial court noted that if it had such evidence, it "might

24

have decided differently." The trial court also observed Ben and Shelby's incessant bickering during the course of the trial, suggesting their inability to neutrally discuss travel and visitation.

In its oral presentation of the final orders, the trial court reiterated its intention to prevent harm to the children by imposing a default visitation location of King County, with the option for variance at the children's independent request:

> So as I said, the visits are going to happen in King County and my thought process there is because it is not in the best interest of the children to have to bear the impact of the travel to have time with their dad. If the children desire a visit in Spain or another country, if you decide to relocate, the Court will allow it. It has to be children directed.
>
>  . . . .
>
> [T]he idea is to have them be with their father. I don't see a reason to limit it to where he lives. The main concern was, it should be the children's decision. They should want to do the travel, one, and then so long as it's a country that's a signatory to the Hague convention, then the safety risks there are minimized for purposes of the Court's concern for the best interest of the children. . . But I see no reason to limit the father's ability to travel with the children internationally.

The trial court further memorialized its consideration of harm to the children in its supplemental findings of fact:

> Washington is the children's home state. The Court is ordering visits to occur in King County, WA, because the travel time that is necessary to accomplish visits between the children and the Petitioner should not be the children's to bear. That is not in their best interest.

The trial court also made clear it was "authoriz[ing] a one-time communication for each parent to basically inform the kids in a neutral way that visits will be in King County unless they specifically request a visit outside of King County." The court explained that

it was limiting this communication because it wanted to prevent the children from psychological coercion by Ben and Shelby:

> [T]he reason I'm making it one conversation, sir, is because if you or Ms. Dobbs is asking them or telling them . . . you get to decide if you want to have the visits here or somewhere else and it becomes a situation where both of you or either of you are trying to influence their decisions and putting them in conflict. And so that's why I limited it to one, because I don't want that for these kids to be constantly reminded that it's within their choice. If you tell them they know it and move on.

The court also asked Ben and Shelby to each choose a third-party relative "to intervene if either one of you are using language that tries to dissuade the children from making a free and independent choice about where they want to exercise their residential time." The trial court explicitly stated in its written findings of fact that its intention in limiting the communication to a one-time conversation in the presence of a neutral relative "is that each party present the children with this information in a neutral and factual way." The court was clearly concerned that "overall, there's a question surrounding whether or not there is a desire or intent by the children to go to Spain or any other country to travel. . . . I'm convinced that there's sufficient reason based on the evidence that I received that that might be an issue for the children."

Additionally, at the time of trial, Ben and Shelby's children both had "Individualized Education Plans" (IEPs) in school. One of their children was diagnosed with oppositional defiance disorder and Attention-Deficit/Hyperactivity Disorder (ADHD), qualified for special education services, and had documented issues with anger management, including running away and throwing things. The other child was also "considered special ed," had relied on accommodations such as speech-to-text and extended time on tests, and experienced a period of depression affecting his

schoolwork. The older of the boys was heavily involved in a traveling soccer team and learning to drive.

Given that the children had specialized educational plans in school and were active in sports, the trial court was concerned about them enduring hours of trans-Atlantic flights and being caught in the cross-hairs of parents who communicate poorly with one another and express disdain for one another. These harms exceed "normal distress" due to "travel, infrequent contact of a parent, or other hardships which predictably result from a dissolution of marriage." See Littlefield, 133 Wn.2d at 55.

This court affirmed a similar travel restriction in a parenting plan in In re Marriage of Fahey, 164 Wn. App. 42, 262 P.3d 128 (2011). In Fahey, the parenting plan limited the location of the father's weekend residential time to the Omak area of Washington. Id. at 66. The trial court observed that "for several years [the children] spent multiple hours in a car several days a week" when their father brought them from Edmonds to South Puget Sound schools. Id. at 67. The trial court was "concern[ed] about this pattern of spending hours in a car continuing because of [the father's] wishes rather than based on [the children's] best interests." Id. Accordingly, the trial court imposed the geographic limitation on the father's residential time, reasoning, " 'the Court is concerned with two pre-teen and teenage girls spending their lives in cars, being transferred to one place and another place as opposed to participating in normal activities that they may have with their friends in Omak, despite the fact that it is their father's weekend.' " Id. at 67. This court affirmed the restriction "[b]ecause the trial court explained its restrictions with reasons that are not untenable." Id. at 66.

As in Fahey, here, the trial court provided tenable reasons for imposing geographic restrictions on Ben's residential time, including identifying a default location of King County, and for its limitations on the parents' communications with the children about their desires to engage in international travel to spend residential time with their father. Those restrictions were reasonably calculated to prevent emotional harm to the children given the circumstances. Accordingly, the trial court did not abuse its discretion by including the challenged provisions in the parenting plan.

## IV. Attorney Fees

Ben asks for attorney fees under RAP 18.1 and RCW 26.09.140. Shelby asks this court to deny Ben's request and, in the alternative, to award fees to her because Ben's appeal is frivolous and meritless, Ben has the ability to pay, and Shelby "expects to be able to establish that she has financial need." Shelby timely filed an affidavit of financial need as required by RAP 18.1(c); Ben did not.

"This court may award attorney fees after considering the relative resources of the parties and the merits of the appeal." Wright, 179 Wn. App. at 270. Where the issues presented are not frivolous and the parties have a demonstrated ability to pay, the court will not award attorney fees. See Schnurman, 178 Wn. App. at 644-45. "An appeal is frivolous if there are no debatable issues on which reasonable minds might differ and it is so totally devoid of merit that there is no reasonable possibility of reversal." Id. at 644. Pursuant to RCW 26.09.140, an appellate court may "in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney[] fees in addition to statutory costs" based on "the financial resources of

both parties," provided the party seeking fees submits an affidavit of need as required by RAP 18.1(c).

Here, the issues were not frivolous, as both parties presented debatable issues, so Shelby should not receive fees on that basis. Further, both parties have demonstrated the ability to pay. See Wright, 179 Wn. App. at 270 (court found party was "able to carry his own attorney fees on appeal" where party was awarded over $8 million in property in dissolution action). The trial court awarded Ben over $1 million in assets and Shelby over $3 million in assets and denied Shelby's request for fees "mostly . . . as the Court has awarded her the marital home," a significant asset. Based on the financial value of the assets awarded to each party and their respective abilities to pay, we decline to award attorney fees to either party.

CONCLUSION

Affirmed.

_____
Chung, J.

WE CONCUR:


_____        _____
Bui, J.                                 Mann, J.